
# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JANI GWEN WHITNEY, | Case No.: **16-1600** |
| Relator, | |
| v. | **ORIGINAL COMPLAINT FOR:** **Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.*** |
| CLP REGENCY OF TEXAS, LLC; AND CLP HEALTHCARE SERVICES, INC., D/B/A HOSPICE COMPASSUS | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | **JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT

Relator, Jani Gwen Whitney, through her attorneys and on behalf of the United States of America, hereby files this Original Complaint against Defendants, CLP REGENCY OF TEXAS, LLC, and CLP HEALTHCARE SERVICES, INC., both doing business as HOSPICE COMPASSUS, (collectively referred to herein as "Compassus" or "Defendant"), and alleges as follows:

### I. INTRODUCTION

1.  Relator, Jani Whitney brings this *qui tam* action pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, arising from Defendant's fraudulent schemes in connection with false claims submitted to the Government for hospice services.

2.  Relator brings this action on behalf of the United States and the Department of Health and Human Services ("HHS") and the Center for Medicare and

1

Medicaid Services ("CMS"), which administer the federal Medicare and Medicaid Programs.

3.      Medicare is a federally funded health care program that provides basic medical insurance to qualified residents of the United States who are age 65 or older, younger people with disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). Medicare is not a free health care program, as United States citizens through their taxes pay a majority of the Medicare Program's costs. In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare pays for what is known as hospice care for eligible Medicare recipients.

4.      Compassus is a for-profit national network of hospice providers. Compassus significantly funds its operations and its employees through receipt of Medicare dollars on behalf of individuals who are supposed to be eligible to receive Medicare hospice benefits.

5.      To be eligible for hospice care paid by Medicare, an individual must be "terminally ill," meaning that that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3.

6.      While elderly patients may qualify for a variety of other medical services paid by Medicare, for-profit hospice companies like Compassus are entitled to receive Medicare dollars only for Medicare recipients who are "terminally ill." When a business such as Compassus admits a Medicare recipient to hospice care, that individual no longer receives, or is entitled to receive, services intended to cure his or her illness. Instead the individual can receive only palliative care, meaning care intended to relieve

pain, symptoms, or stress of terminal illness, including a comprehensive set of medical, social, psychological, emotional, and spiritual services. Congress authorized funding from limited Medicare funds for this specialized hospice benefit during the last several months of an individual's life.

7.     Compassus, through its reckless and intentional business practices, admitted and retained individuals across the United States who were not eligible to receive Medicare hospice benefits, because it was financially lucrative, and did so even after Relator alerted her coworkers, supervisors and even the CEO of Compassus to this pattern of Medicare fraud. Compassus misspent millions of Medicare dollars intended for Medicare recipients who have a prognosis of six months or less to live and need hospice care.

8.     Compassus is liable under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, due to its conduct in submitting false and fraudulent records, statements, and claims for payment by the United States to the Medicare Program.

## II. THE PARTIES

9.     Relator, Jani Gwen Whitney, is a citizen of Texas, residing in Kingwood, Harris County, Texas.

10.     CLP Regency of Texas, LLC ("CLP"), is a foreign limited liability Tennessee company, registered to do business in Texas. Its address in Texas is 350 N. Saint Paul St., Dallas, TX 75201-4201. Its registered agent for service is C T Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136. It operates under the name Hospice Compassus. At all times relevant to the events described in this Complaint, Defendant was engaged in the business of providing hospice care to

3

individuals who were eligible to receive Medicare.

11.     CLP Healthcare Services, Inc. ("CLP"), is a Delaware corporation with headquarters and principal office at 10 Cadillac Drive, Suite 400, Brentwood, Tennessee 37027-1001. It operates under the assumed name "Hospice Compassus." Its registered agent for service is C T Corporation System, 800 S. Gay St., Ste 2021, Knoxville, TN 37929-9710. At all times relevant to the events described in this Complaint, Defendant was engaged in the business of providing hospice care to individuals who were eligible to receive Medicare, and managing the network of locations that were part of the Hospice Compassus network.

## III.  JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

15.     Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. §

3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made this pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2). Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing his False Claims Act complaint.

16.     Relator is familiar with Defendant's fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## IV. THE FALSE CLAIMS ACT

17.     The False Claims Act provides, in pertinent part, that any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government [for statutory damages and such penalties as are allowed by law]. 31 U.S.C. §§ 3729(a)(1)-(2) (2006), amended by, 31 U.S.C. §§ 3729(a)(1)(A)-(B) (2010).

18.     For purposes of the False Claims Act, "knowing" and "knowingly" (A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no

proof of specific intent to defraud. 31 U.S.C. § 3729(b) (2006), amended by, 31 U.S.C. § 3729(b)(1) (2010).

## V. THE MEDICARE PROGRAM

19.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

20.     The Medicare Program is comprised of four parts. Medicare Parts B, C and D are not directly at issue in this case.

21.     Part A of the Medicare Program is a 100 percent federally funded health insurance program for qualified residents of the United States aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Part A of the Medicare Program include hospice care under 42 U.S.C. §1395x(dd).

22.     The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS. CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" (hereinafter "MACs") to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as Defendant's providers. In this capacity, the MACs act on behalf of CMS.

23.     Payments are typically made directly to health care providers, such as Defendant's providers, rather than to the patient. This occurs when the Medicare

recipient assigns his or her right to payment to the provider, such as Defendant's providers. In that case, the provider submits its bill directly to Medicare for payment.

24.     In order to bill the Medicare Program, a provider must submit an electronic or hard copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

25.     On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

26.     All healthcare providers, including Defendant's providers, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part A.

27.     A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following: (a) Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. See 42 U.S.C. § 1395y(a)(1)(A), and (b) Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. See 42 U.S.C. § 1320c-5(a)(1).

28.     Medicare regulations exclude from payment services that are not reasonable and necessary. See 42 C.F.R. § 411.15(k).

29.     Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment under Medicare Part A on the

basis of the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient." The claims are paid from the Medicare Trust Funds, funded by American taxpayers.

## VI. APPLICABLE REGULATIONS

30. Hospice is a program to provide palliative care to patients instead of curative care. Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness. It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual. Medicare recipients who elect hospice care agree to forego curative treatment of their terminal illnesses. In other words, patients who receive the Medicare hospice benefit no longer receive care that leads to a cure of their illnesses.

31. Pursuant to 42 C.F.R. § 418.20, in order to be eligible to elect hospice care under Medicare, an individual must be—(a) Entitled to Part A of Medicare; and (b) Certified as terminally ill in accordance with § 418.22.

32. According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

33. Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

34. The initial 90-day period must be certified by (a) the Medical Director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the individual's attending physician, if the individual has an attending physician. For

subsequent periods, certification requires only one of the aforementioned physicians. 42 C.F.R. § 418.22.

35.    The written certification requires: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s). Id.; Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

36.    Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302. To be covered, hospice services must be:

> reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

37.    It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

38.    Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical

findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

39.    Local coverage determinations ("LCD") specify under what clinical circumstances a service is considered to be reasonable and necessary and thus covered by Medicare. Medicare administrative contractors ("MAC") issue LCDs to provide guidance to the public and medical community within their jurisdictions. MACs develop LCDs by "considering medical literature, the advice of local medical societies and medical consultants, public comments, and comments from the provider community." Medicare Program Integrity Manual, Chapter 13, § 13.1.3.

40.    Palmetto GBA, LLC ("Palmetto") is the MAC responsible for processing Home Health and Hospice claims submitted by Defendant for payment by Medicare. Palmetto has issued LCD's that set forth medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live.

41.    Palmetto's hospice-related LCD's include: Hospice - HIV Disease (L34566), Hospice - Liver Disease (L34544), Hospice - Neurological Conditions (L34547), Hospice - Renal Care (L34559), Hospice Alzheimer's Disease & Related Disorders (L34567), Hospice Cardiopulmonary Conditions (L34548), and Hospice The Adult Failure To Thrive Syndrome (L34558).

## VII. THE RELATOR

42.    Relator, Jani Gwen Wallace-Whitney received a Bachelors of Science-Nursing degree from Western Governors University in Salt Lake City, Utah. She received an Associates Degree-Nursing degree from Lee College in Baytown, Texas.

43.    She is a Certified Hospice and Palliative Nurse, and is an Approved

10

Hospice and Palliative Educator by the HPNA (Hospice and Palliative Nurses Association.)

44.     Relator is the Vice-President of the Greater Houston Area chapter of the HPNA.

45.     She has continually worked in nursing from 2004 to May 2016, and has worked in the hospice field since 2008.

46.     She was hired by Compassus on April 4, 2016, as the clinical liaison to the Texas Medical Center. Her job duties were to evaluate patient appropriateness for hospice care, obtain signed consent forms, order equipment and comfort kits for patients, arrange ambulance transport, coordinate patient admission with the admission nurse, report on patient evaluation, documentation of consent, GIP (General Inpatient care) admissions.

47.     Shortly after being hired, she began to witness the wrongdoing described below in this Complaint. She made good faith efforts to educate her co-workers and supervisors about the applicable regulations and encourage Compassus to comply, but her efforts were constantly rebuffed.

48.     She was terminated by phone by Lamar Wade and Dawn Kindhart on May 27,2016, shortly after her most recent report to Compassus's CEO, James Deal, regarding regulatory and compliance issues, and retaliation.

## VIII. THE DEFENDANTS

49.     Defendant, CLP Regency of Texas, LLC, operates as "Compassus" or "HOSPICE COMPASSUS" in Texas.

11

50.     CLP Regency of Texas, LLC is part of a nationwide chain of hospice companies operating under the "Compassus" and/or "Hospice Compassus" names, all under common management and control.

51.     CLP Healthcare Services, Inc. is a Delaware corporation with headquarters in Brentwood, Tennessee, a suburb of Nashville. It operates under the assumed name "Hospice Compassus."

52.     In 2009, CLP Healthcare Services, Inc., changed its name to Hospice Compassus. It aggressively buys other hospice companies and places them under common control of the Brentwood headquarters.

53.     According to its website, www.compassus.com, Compassus is a nationwide network of community-based hospice and palliative care services (now including Life Choice Hospice and Hospice Advantage), based in Nashville, Tennessee, and operating in more than 150 locations across 28 states, with a common culture throughout all locations.

54.     Although this network of companies includes individual corporations, it operates as a single entity under control of the Brentwood headquarters. All employees of Compassus answer to the Brentwood headquarters, and receive their common training from the Brentwood headquarters.

55.     Although Relator was employed at a Houston Compassus location, she obtained training at the national headquarters in Brentwood and the practices she alleges herein are company-wide practices that emanated from the top.

## IX. THE SUBMISSION OF FALSE CLAIMS

56.     During April and May of 2016, and presumably for several years before

12

that, Defendant knowingly submitted or caused the submission of false claims to Medicare and created false records and statements to receive reimbursement from Medicare for hospice care. Although Compassus only employed Relator for a short time, it was clear that the patterns of fraud she witnessed had been in place for years.

57.    During this time, Compassus falsely certified on electronic claim forms submitted to Medicare that hospice care provided to Medicare recipients across the United States was "medically indicated and necessary for the health of the patient."

58.    Compassus created and/or submitted documentation that falsely represented that certain Medicare recipients were "terminally ill," meaning that the "individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

59.    Many of the Medicare recipients were not eligible for hospice care paid for by the Medicare Program because they did not have a prognosis of six months or less to live if the illness runs its normal course.

60.    A sophisticated hospice provider such as Compassus is expected to fully know and appreciate the Medicare statute, the definition of "terminally ill," and the local coverage determinations that set out medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live. The purpose of the Medicare requirements is to ensure that the limited Medicare funds are properly spent on services actually needed by Medicare beneficiaries. Compassus has a duty to deal honestly with the Government.

61.    Compassus knew, deliberately ignored, or recklessly disregarded that the claims it submitted to Medicare falsely represented the medical condition and hospice

eligibility of the beneficiaries. In addition, Compassus knew or recklessly disregarded that its business practices would lead to the submission of false claims to Medicare for hospice services provided to ineligible beneficiaries.

A.   **Compassus did not adequately train its staff on the regulations and local coverage determinations concerning eligibility for Medicare hospice benefits, and instead just trained them to maximize profits.**

62.    Compassus set aggressive targets for the number of patients for whom it could bill Medicare or other insurance that it wanted each of its providers to achieve, known as census targets, and pressured its employees to meet those targets.

63.    While Compassus is a healthcare service specializing in the care of "terminally ill" persons, Compassus's primary emphasis was on sales, i.e., maximizing billing for hospice services without regard to whether patients were eligible for hospice, and without concern about the quality of care provided.

64.    Every Sales person, along with all Clinical staff are required to attend intensive sales training course in Brentwood, Tennessee, the site of Defendant's corporate headquarters.

65.    Clinical staff is required to attend 3 weeks of sales orientation, but are not required to attend any clinical training or obtain certification in Hospice Nursing, regardless of the staff member's level of experience in Hospice, or knowledge of rules, regulations, or admission criteria.

66.    Defendant's "Sales Training" relating to hospice patients includes lessons on what types of patients make the best potential sales targets, and which of those have the greatest potential for profit to Compassus.

67.    Defendants have employees called Hospice Care Consultants or

14

Marketers (abbreviated as "HCC") who are nothing more than salespersons, and are required to make at least 50 in-person contacts with referral sources each week.

68. Defendants pay bonuses to HCC's on a tiered reward system, with bonuses increasing when HCC's reach a higher tier based on their "closing percentages" and "conversion rates." This system incentivizes HCC's to increase their hospice admission rates, regardless of whether patients meet the criteria for hospice.

69. Defendants maintain a databank of referral sources called "Sales Force," which includes personal information on referral sources such as favorite foods, favorite activities, and personal interests to help HCC's develop personal relationships with these referral sources.

70. Each referral source is given a letter grade based on its likeliness to be "completely selective" to Compassus, meaning to exclusively refer patients to Compassus. A "C" letter grade is given to a referral source with a low probability to refer patients to Compassus, and Compassus's rule is that HCC's can have no more than 10% of the accounts in their "Book of Business" with a C grade.

71. Compassus trains its employees to encourage their referral sources to tell patients that Compassus is the only available choice for hospice care.

72. Compassus requires that HCC's maintain a "conversion rate" (meaning the percentage of referrals who are admitted) of at least 80%. HCC's with the highest conversion rates get greater bonuses, and are rewarded with vacations and travel. Because clinical personnel are not eligible for these types of bonuses and rewards while practicing in a clinical role, some of them elect to operate in a non-clinical role in order to make more money.

73. Compassus allows its Registered Nurses to work as marketers/HCC's, focusing on sales, if they choose not to use their clinical credentials in order to receive the cash bonuses for admissions. As stated by Darla and Brandi, they choose no to work as RN's, so it "doesn't look like a conflict of interest." However, the fact that some Compassus RN's choose to function in a salesperson role, rather than a nursing role, does not change the fact that a clinical nurse is being paid a cash incentive to make a clinical judgment that a person is eligible for hospice, and allowing that cash incentive to cause them to falsely certify patients as hospice eligible.

74. These RN's use their clinical status to take phone orders from doctors for hospice admission. Relator refused to not use her RN credentials when making hospice admissions at hospitals and as a result, she was found to be ineligible for bonuses and the bonuses were paid instead to the Compassus HCC assigned to the hospital where Relator made the admission.

75. Patients who return to Compassus after 45 days off-service, count once again toward admission goals.

**B.** **Compassus routinely and systemically violated regulations and local coverage determinations concerning eligibility for Medicare hospice benefits.**

76. Compassus routinely allowed admission nurses to make the initial determination of a patient's eligibility for hospice.

77. Compassus's HCC's routinely approached hospital patients and/or their family members, while the patient was still in the hospital, to persuade patients to sign consent forms and have them admitted to hospice prior to RN or MD assessment of the patient for hospice eligibility.

78. The executive director of Compassus's Houston Office, Brandi Gabriel, RN, stated that Houston is a very competitive market and that "we do what we have to do to get the admissions", including General Inpatient Care (abbreviated as "GIP") admission at the hospital. Compassus aggressively sought to admit patients in hospitals before they had the chance to consider other options.

79. Compassus HCC's regularly visited hospitals to evaluate patients, often without an order from a Licensed Medical or Nursing professional evaluation for appropriateness.

80. Compassus marketing personnel routinely approached patients, or patients' appointed proxies, to have consent forms signed, selecting Compassus for Hospice care.

81. During Relator's sales training in Nashville, the national director of sales training (David Tresch) trained Relator and other trainees properly that they are not allowed to approach a patient prior to clinical evaluation verifying that the patient is appropriate for hospice care. However, Tresch also stated that each trainee should follow the instructions of the Executive Director and Sales Director at his or her local office.

82. In fact, this rule was routinely violated by orders of the Executive Directors and Sales Directors of each location who encourages the violation of this rule in order to maximize admissions.

83. Members of Compassus sales teams from different areas of the United States admitted that they routinely violate this rule and always go into the hospitals and begin the hospice admission process, even if the patient has not been evaluated for

hospice appropriateness. Relator has specifically witnessed Compassus HCC's Kasey Howling and Brandi Hypo lite signing patients on to hospice care prior to Physician Order or Evaluation.

84.     Hilda Morales, a Compassus HCC, stated that Compassus forces its marketers to have patients sign consent and election of benefits ("EOB") forms, and that those patients were routinely admitted to hospice service without a witness signature on documents until the admitting nurse arrives at the patient's home to perform an evaluation.

85.     Morales stated that admissions documents, such as consent forms, "EOB" forms, "NOS" (Notification of Start Date forms, stating when hospice admission begins), and "CTI" (Certificate of Terminal Illness forms) were regularly prepared fraudulently, with no enforcement mechanism to prevent the fraud.

86.     When Relator advised Morales that these documents were submitted to the Federal Government to justify Medicare payments, and that the fraudulent preparation of these documents was illegal, Morales was shocked to hear this, responding, "I need to find another job", "these people (Compassus) are so crooked."

87.     Compassus HCC's routinely obtain signed consent forms leaving the date blank, or filling in the date with "Upon Medical Eligibility." Every such form is evidence of an improper admission.

88.     Applicable hospice regulations require that patients have hospice eligibility established prior to consent for admission and hospice treatment.

89.     Relator, unlike her co-workers, had training in the CMS regulations regarding hospice and shared her knowledge with her co-workers when she saw them

violating basic regulations and LCD's. Relator's supervisors met with Relator to counsel or coach her on the way Compassus operated, including the handling of paperwork.

90.     Relator was instructed to stop educating her co-workers about applicable regulations, and told to follow Compassus's procedures.

91.     Under Compassus's procedures, once a patient is discharged from a hospital, and arrives at the destination where hospice care will be provided, a Compassus employee fills in the date, then contacts Dr. Jeffrey Lee, who signs the admission document, signs the Certificate of Terminal Illness, and gives orders to place the patient on Hospice care after consent and admission forms are already complete.

### C.     Examples of Medicare-eligible patients who Compassus knew were not eligible for Medicare hospice benefits.

92.     Patients were ineligible for multiple reasons including (a) that they did not agree to forego curative treatment of their illnesses, (b) that they did not have a medical prognosis with a life expectancy of 6 months or less if the illness runs its normal course, (c) they lacked the required physician certifications and signatures, specific clinical information and findings and other documentation supporting a life expectancy of six months or less; (d) they lacked legitimate elections from the patient or person with the patient's power of attorney; (e) the services provided were not consistent with a legitimate and valid plan of care; (f) they did not comply with applicable local coverage determinations ("LCD") for reasonable and necessary services.

93.     Relator has evidence of numerous examples of improper billing for hospice benefits, for the reasons described above.

94.     This evidence includes POP documents (Proof of Plan - Monthly

Certifications of Compliance) in Relator's possession, which specifically list the names of patients and the documents and information missing from their files.

95.     The evidence also includes Census reports which list each of Compassus's patients for each location, including the following information for each patient: the responsible physician, the terminal diagnosis, whether Medicare is the payor, and the SOC (Start of Hospice Care) date. Relator has notes based on her first-hand knowledge regarding why these diagnoses were not appropriate for hospice service.

96.     This evidence is incorporated herein by reference and will be submitted to the Court separately under seal in order to maintain patient confidentiality.

97.     In one case, Jonas Ousley, RN was was asked to admit **Patient 1** to hospice service, but was not able to make contact with the physician on call. Mr. Ousley sent out an email requesting assistance with this issue, but received no reply from a physician. Relator and Nurse Christina Oliver replied to Mr. Ousley that the patient was not appropriate for hospice care under the applicable guidelines.

98.     **Patient 2** was admitted to Hospice with an admission order from Brandi Gabriel, RN for diagnosis of End Stage Respiratory Disease. This is beyond the Nursing Scope of practice. Relator attempted to advise Nurse Gabriel about the Rules and Regulations of Hospice, and admission criteria. Nurse Gabriel stated to Relator that she was wrong about this. Nurse Jonas Ousley states in one email that he heard Brandi Gabriel, RN offer a diagnosis while speaking with a physician and, although the physician never responded or confirmed the diagnosis, the Nurse used the diagnosis to admit the patient.

99.   Patient charts were reviewed by a corporate compliance nurse in Compassus's home office in Brentwood, Tennessee.

100.   Jonas Ousley, RN told Relator that Brandi Gabriel, RN (the Executive Director of Compassus's Houston Office) called him in and ordered him to change documentation on patient charts.

101.   Under pressure from Ms. Gabriel, the Executive Director, and with fear of being terminated, Jonas Ousley, RN did in fact change documentation on the chart of a patient who did not meet the guidelines for hospice admission to make it appear that he did.

102.   Jonas Ousley, RN was specifically directed by Ms. Gabriel to eliminate the evidence that Compassus was admitting patients without a doctor's order who did not meet hospice admission criteria in order to defraud CMS into paying Compassus for hospice care for patients who were ineligible.

103.   Jonas Ousley, RN admitted these facts to Relator but when called upon to admit them to a compliance nurse he chose to protect Ms. Gabriel. Mr. Ousley eventually quit in lieu of termination and is no longer employed by Compassus.

104.   Ms. Gabriel told Relator to stop offering Jonas Ousley advice on CMS Rules and Regulations and to mind her own business.

105.   Relator reminded Brandi Gabriel, RN Executive Director and Darla Clement, Sales Director (both representatives at the supervisory level) that they, by email, had instructed all Case Managers and HCC'S to advise her of all new admissions, and to give her all of the patients' clinical data. Darla Clement, whom is a non-clinical employee, instructed Relator that Relator was not allowed to make

21

decisions as to the appropriateness of the patients' admission.

106. At this time, Ms. Clement advised Relator that Compassus does not use "LCD's" (Local Coverage Determinations) to determine admission criteria, but rather uses "Creative Diagnoses" to determine admission criteria. Relator has an audio recording of this conversation among Relator, Brandi Gabriel, and Cecelia Gonzales, RN, in which Relator advised Cecelia Gonzales, RN that she was advised by non-clinical personnel that the company does not use "LCD" to determine admission criteria. Before Nurse Gonzales was able to respond to statement, Nurse Gabriel interjected that Compassus uses "LCD" as a base guideline, but not an absolute factor in determining eligibility for admission, and that Compassus does have to be creative at times in order to place some patients on service. Nurse Gonzales informed Relator that she (Relator) was aware of proper guidelines for admission.

107. Brandi Gabriel informed Relator that "our Doctors are different"; "they use a more aggressive form of hospice care." When asked to explain the statement, Nurse Gabriel stated that the Doctors of Compassus may at times use aggressive treatments, including blood transfusion, chemotherapy, or radiation procedure, and that the Doctors used these aggressive forms of treatment for some hospice patients, "to ease their minds."

108. These treatments are prohibited from hospice care, and grounds for revocation from hospice. Relator asked how Compassus could bill for these services and did not get an answer but was told that Dr. Merkelz is a huge supporter of this practice.

109. Compassus maintained an Interdisciplinary Team "IDT," which included

Dr. Lee as the physician on the team. Dr. Lee showed no interest in hearing reports on the patients under his care. If any clinical staff questioned his orders, he would become aggressive and abrasive toward the staff member.

110. Key assessment tools used in the hospice industry include the Functional Assessment Scale (or Staging), abbreviated as "FAST"; the Palliative Performance Scale, abbreviated as "PPS"; the Body Mass Index, abbreviated as "BMI"; the Mid-Arm Circumference, abbreviated as "MAC"; and the New York Heart Association, abbreviated as "NYHA".

111. Nurse Miaya Wright had attempted on a number of occasions to advise Dr. Lee of the status of **Patient 3**. Dr. Lee had admitted **Patient 3** to hospice for diagnosis of "Head Injury." Upon Relator's first IDT with Compassus, she witnessed Dr. Lee snap at a nurse who informed him of the need to discharge **Patient 3** from hospice. He rejected the nurse's opinion, insisting that **Patient 3** was appropriate for hospice, then signed the Face-to-Face evaluation on **Patient 3** without ever leaving the table. He then told the nurse to be sure that **Patient 3** stays on service.

112. Relator and Nurse Christina Oliver were sent to **Patient 3's** house to re-admit her to Compassus for hospice service. Upon arrival to the patient's home, both nurses assessed the patient and her clinical data. Relator observed that **Patient 3** did not have a head injury, and was under the care of another physician at the same time.

113. Physician #2 noted that **Patient 3** was on Hospice for "End Stage Dementia"; the patient is awake, alert, and oriented x 2; still transfers, continent, and scored 6(C) on FAST.

114. Nurse Oliver contacted Compassus's Houston Office and explained to

23

Director Brandi Gabriel the current findings on **Patient 3**, which confirmed that the patient was not eligible for hospice treatment as explained to Dr. Lee during the IDT. Nurse Gabriel instructed Nurse Oliver to, "find something on her", and to re-weigh her. She was informed that there was nothing to find about this patient that would make her eligible for hospice, and that the patient was actual indicating signs of improved health, including gaining weight, considerable increase in "MAC" over the past year while on service.

115.  Additional evidence regarding patients is being submitted electronic document incorporated herein by reference.

116.  Although the Executive Director and Physician stated that they would discharge the patient from Hospice that day, it was more then a week before she was actually discharged from Compassus.

117.  Per Relator, through first hand knowledge, Compassus does not follow applicable regulations in multiple ways.

118.  Patients' Plans of Care are not consistently updated. The physician does not want a full report on "his" patients. What information he does choose to hear, he does not always use for decision-making.

119.  Relator's first interaction with Dr. Lee was to discuss the current census. Dr. Lee informed Relator that he expected the number of patients would remain constant or increase. Relator replied to Dr. Lee that she would not place anyone on service that did not qualify for hospice. Dr. Lee's reply to this statement was, "they are always appropriate." Dr. Lee made it clear to Relator that he expected the number of patients on service to stay at a certain level regardless of whether they met hospice

criteria, and ridiculed her for her knowledge of the applicable regulations and intention to follow them.

120.    On a separate occasion, **Patient 4**, a friend of Dr. Lee, was admitted on to service with Compassus for "malnutrition." It was stated that "malnutrition" was used as the basis for hospice service because "we can not use debility anymore." The original admission nurse, "Johnnie" arrived to admit the patient and found the patient to be awake, alert, and oriented, with a stated history of migraines and depression.

121.    **Patient 4** told Jonnie that she allowed her daughter to sign consent for admission because Hospice would pay for her medications and she could have a CNA stop by and check on her. Johnnie, RN contacted Dr. Lee to inform him that the patient does not meet hospice admission criteria and that she was not going to admit the patient. Dr. Lee insisted that she be admitted. Johnnie left **Patient 4's** home without admitting the patient and another nurse was sent out, who did admit the patient to hospice. Compassus was aware of the admission, and willfully ignored its responsibility to remove the patient from service, and to report the Physician's fraud to proper authorities.

122.    While Relator was in Brentwood, Tennessee for training at Compassus's corporate office, she spoke with two women, Felicia [last name unknown] and Erika Yates, who worked at Compassus's headquarters' billing department in Brentwood.

123.    Erika Yates was emotionally distraught, and confided to Relator that she was being forced by her supervisor to add false information to patients' Certificates of Terminal Illness.

124.    She stated that many "CTI" forms arrived at the billing department

25

incomplete, often with no diagnosis at all. She was instructed by her supervisor to fill in a diagnosis where they were left blank. When she refused, she was threatened with termination. She could not lose her job because her husband was a dialysis patient whose treatments were covered by Compassus' insurance. She was forced to choose between committing Medicare fraud and losing her job and her husband's insurance coverage.

125.   Relator was concerned with what she was hearing about her employer's systemic Medicare fraud.

126.   Relator asked Compassus's billing coordinators why Compassus did not have "EHR" or "EMR." She was told that Compassus had to pay yearly fines for not having an electronic charting and billing system and that the CEO believed it was cheaper to pay the fines then it would be to establish an electronic charting system, and that it was easier to hide fraudulent claims with paper charting.

127.   Relator has first-hand knowledge of admission of patients with no physician listed for admission, and that Dr. Lee would often sign CTI forms for patients weeks after they were admitted to Hospice. She has seen many charts that had no signed EOB's, CTI's, or incomplete consent forms.

128.   Relator was assigned to evaluate **Patient 5** at MD Anderson Cancer Center in the Texas Medical Center. MDA, is one of the worlds largest and busiest Cancer research hospitals in the world. **Patient 5** had a diagnosis that could not be seen as meeting the six-month limit. Relator was told that Compassus's Houston Office was attempting to bring this patient on to hospice service in order to gain acceptance at MD Anderson, with the hopes of creating future referrals, and generating a great deal of

revenue from MD Anderson.

129.   Compassus has a large number of patients who do not have prognoses less than six months, which makes them ineligible for hospice service. Nevertheless, some of these patients have been on hospice service with Compassus for years.

130.   The Sales Department for Compassus was under intense pressure to increase admissions and revenue without regard to whether regulations were violated and documents were falsified. When Relator threatened to report the fraudulent practices, Compassus employees began trying to tarnish her reputation.

131.   While training in Tennessee, Compassus sales directors from other regions arrived from a seminar in Arizona. All of the sales directors had never worked with Relator before this time, yet they all knew who she was. Compassus employees attempted to get the Relator fired or pressure her to quit.

132.   Relator not only completed the training class, but also obtained the highest scores on Compassus's sales training since its inception.

133.   As part of Relator's training, she was instructed to follow Kasey Cowling on her daily job as an HCC. While orienting with Ms. Cowling, she stated that she had to visit a referral in a nursing home. And that this would be her 7th time making contact with the patient's family. Relator asked Ms. Cowling why she made that many visits which seemed to border on harassment. Ms. Cowling stated that HCC's were under a great deal of pressure from their Sales Director, Darla. She stated that if sales personnel did not meet strict requirements, that they would be fired.

134.   She was also giving small gifts to persons the sales department refers to as "specific influencers and decision makers." These gifts were delivered to facility

managers in their offices. Because these gifts were generally against the hospitals' policies, these gifts were provided secretly.

135. Compassus uses an Incentive rewards program to influence HCC's to get referrals for admission. HCC's are paid bonuses on a tier level system, with bonuses increasing based on the number of admissions generated by the HCC. The highest tier of the bonus system is the "Presidents Circle," which entitles an HCC to additional prizes and trips.

136. Multiple incentives are given to Compassus's sales team to admit as many patients as possible. With these incentives, and promise of large bonus payouts, HCC's have been placing patients on hospice service for diagnoses that do not meet CMS Guidelines.

137. Supporting documentation reflects incorrect ICD-9 and ICD-10 codes, and having patients on Hospice service for Years.

138. Along with admissions logs, documents submitted with this narrative will show that Compassus's sales director in regular emails indicating that census is low. And that staff needs to increase their numbers. In one document sales director is noted as stating to staff that they need to have four (4) admissions per day.

139. The clinical staff of hospitals (which were key referral sources for Compassus) routinely sent emails discussing discharge planning to Compassus sales staff rather than to Compassus Clinical Case Managers, Admission Nurses, or Attending Hospice Physicians. Compassus's referral sources commonly had more contact with Compassus's sales staff than with its clinical Staff.

140. Sales Director, Darla Clement, advised Compassus Clinical and Non-

Clinical staff how to fill out consent forms for acceptance of Hospice Service. She advised staff not to place dates on consents, and instead to write "Upon Medical Eligibility."

141.    Compassus routinely had patients sign blank or incomplete consent forms, and failed to inform patients (and those with the patients' power of attorney) regarding the meaning of the forms they signed, their right to choose service, right to revoke service, and the rights they were conveying to Compassus.

142.    POP documents (Proof of Plan - Monthly Certifications of Compliance) in Relator's possession indicate which patients have files that omit critical documents, the omission of which makes them ineligible for hospice. Relator has POP documents for the Houston area (incorporated herein by reference and filed electronically) but has seen similar documents from locations throughout Compassus's nationwide network that are the same. This demonstrates that not only does Compassus improperly bill CMS for patients with required documentation missing from their charts, but that leadership of Compassus is aware of the missing documentation, and blatantly continues to submit false claims for payment to CMS.

143.    Drs. Lee, Merkelz, Palacious, and Venyah, all act as Medical Directors to local nursing facilities in which Compassus places patients, and/or from which Compassus receives referrals. These doctors acting as Directors and as Hospice Physicians demonstrate clear unethical behavior.

144.    Nurse Edwin Gomez, a Compassus case manager, experienced moral and professional dilemmas with Compassus. Besides being a case manager for Compassus, Edwin used to practice as a physician in Columbia. Gomez confided to

Relator that the staff never receives the clinical support they need.

145. Defendant has settled a prior FCA case in Alabama resulting from some of the same practices, but continued these practices throughout its nationwide network.

**D. Compassus repeatedly disregarded concerns expressed by Relator that Compassus was admitting and retaining patients who were not eligible for Medicare hospice benefits.**

146. Relator informed Compassus of these inappropriate business practices, following the chain of command, all the way to the level of the CEO.

147. At first, Relator believed the fraud was a localized issue with Compassus's Houston office. Relator went as far as to inform Compassus in writing that continued illegal practices would be reported to the Office of the Inspector General in relation to acts of fraud against CMS. Eventually, Relator learned that the problem was company-wide.

148. Sales Director, Darla Clement, of Compassus continually caused problems for the Relator due to Relator's unwillingness to ignore the rampant fraud.

**FIRST CAUSE OF ACTION**
**Presenting or Causing to be Presented False Claims for Ineligible Patients**
**Under 31 U.S.C. § 3729(a)(1)(A)**

149. Relator re-alleges and incorporates by reference the allegations in this Complaint.

150. By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

151. Defendants submitted false claims for Hospice care provided to patients

whom Defendants knew did not meet Medicare or Medicaid requirements for Hospice (because they were not terminally ill; were still receiving curative treatments; were not properly certified; were missing required plans of care, elections of benefits, certifications of terminal illness, and/or other required forms; or otherwise as described herein), in violation of applicable regulations including 42 U.S.C. §1395y (Exclusions from coverage and Medicare as secondary payer).

152.   Defendants submitted false claims for Hospice care provided to patients admitted under a false diagnosis and to whom Defendants did not provide complete palliative services under a legitimate care plan as required by 42 C.F.R. §§ 418.56 (requiring plans of care and interdisciplinary groups); 418.22 (Certification of Terminal Illness); 418.24 (Election of hospice care); and 418.25 (Admission to hospice care based on medical director's consideration of relevant factors).

153.   Defendants submitted false claims for Hospice services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

154.   The United States paid the false claims described herein.

155.   Defendants' fraudulent actions, as described in this Complaint, are part of a widespread, systemic pattern and practice throughout Defendants' network of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

156.   Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United

States through Medicare and Medicaid for such false or fraudulent claims.

157. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(2006), amended by 31 U.S.C. § 3729(a)(1)(A) (West 2010); that is, defendant Compassus knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for patients across the United States who were not eligible for Medicare hospice benefits during all or part of the time.

158. By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise.

## SECOND CAUSE OF ACTION
### (False Claims Act-31 U.S.C. § 3729(a)(1)(B)

159. Relator re-alleges and incorporates by reference the allegations in this Complaint.

160. By virtue of the acts described above, defendant Compassus knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), amended by 31 U.S.C. § 3729(a)(1)(B) (West 2010); that is, defendant Compassus knowingly made or used or caused to be made or used false

Medicare claim forms and supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States, in Case 2:12-cv-00245-KOB Document 156 Filed 11/02/12 Page 26 of 30 27 that the hospice services claimed were for patients across the United States who were not eligible for Medicare hospice benefits during all or part of the time.

161.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), or any other applicable adjustments to the civil penalties.

### THIRD CAUSE OF ACTION
### Payment Under Mistake of Fact

162.   This is a claim for the recovery of monies paid to Defendants under mistake of fact.

163.   Relator re-alleges and incorporates by reference the allegations in this Complaint.

164.   The above-described false claims and false statements which defendant Compassus submitted to the United States through the Medicare Program or used as a basis for Medicare reimbursement constituted misrepresentations of material fact in that they misrepresented the eligibility of the patient beneficiaries, as well as other facts necessary to establish entitlement to reimbursement for hospice benefits under the

Medicare Program.

165. As a consequence of the conduct and the acts set forth above, defendant Compassus was paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

166. Relator re-alleges and incorporates by reference all allegations in this Complaint.

167. This is a claim for recovery of monies by which Defendants have been unjustly enriched.

168. By virtue of the conduct and the acts described above, Defendants were unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully prays for judgment in her favor as follows:

a. As to First and Second Causes of Action (False Claims Act), against Defendants for: (i) damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

b. As to the Third Cause of Action (Payment Under Mistake of Fact), for: (i) an amount equal to the money paid by the United States through the Medicare Program to Compassus and illegally retained by Compassus, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

c. As to the Fourth Cause of Action (Unjust Enrichment), for: (i) an amount equal to the money paid by the United States through the Medicare Program to Compassus, or the amount by which Compassus was unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

d. The maximum amount to Relator allowed pursuant to 31 U.S.C.A. §3730(d), and/or any other applicable provision of law;

e. Reimbursement for reasonable expenses that Relator incurred in connection with this action;

f. An award of reasonable attorneys' fees and costs; and

g. Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMAND

Relator hereby demands a jury trial.

Dated:  June 7, 2016.


By:     <u>/s/ Cory S. Fein</u>
           Cory S. Fein
           Cory Fein Law Firm
           712 Main St., Suite 800
           Houston, TX  77002
           cory@coryfeinlaw.com
           (281) 254-7717 (phone)
           (530) 748-0601 (fax)

**ATTORNEY FOR RELATOR**